IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BENNET NISBET, | |
| Plaintiff, | Case No. |
| v. | |
| WILLOWBROOK FORD, INC | |
| Defendant. | **Plaintiff Demands Trial by Jury** |

## COMPLAINT

Plaintiff Bennet Nisbet ("Plaintiff" or "Nisbet") states as follows as his Complaint against Defendant Willowbrook Ford, Inc. ("Willowbrook"):

### Nature of the Case

1. Bennet Nisbet brings this action against his former employer Willowbrook Ford, Inc. pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA") and the Illinois Human Rights Act, 775 ILCS 5/2-101, *et seq.* ("IHRA"), seeking relief for illegal discrimination and retaliation, and under Illinois common law for retaliatory discharge for reporting unsafe working conditions. Additionally, Mr. Nisbet seeks relief under the Illinois Whistleblower Act ("IWA"), 740 ILCS 174/15(b) and Fair Labor Standards Act ("FLSA"), 29 U.S.C. §215(a)(3) for retaliation for refusing to break the law and complaining about employees being required to work without compensation. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests a trial by jury.

### Jurisdiction and Venue

2. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4), and 29 U.S.C. § 2617. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a).

3. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this district and all of the events giving rise to Plaintiff's claims occurred in this district.

## The Parties

4. Mr. Nisbet resides in the state of Illinois and was employed by Willowbrook for 23 years, from February 1998 until his termination in March 2021. At the time of his termination, he was 51 years old.

5. Defendant Willowbrook Ford, Inc. is a Delaware corporation doing business in the State of Illinois. Defendant is a full-service automotive dealership, providing vehicle sales, service, repairs and related automotive services.

6. Defendant has several dealership locations throughout the state of Illinois.

7. Defendant is an "employer" as defined by the ADEA, 29 U.S.C. § 630(b) and the IHRA, 775 ILCS 5/2-101(B).

## Administrative Procedure

8. Plaintiff has exhausted all mandatory pre-complaint procedures required by law by filing timely administrative complaints with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR").

9. Specifically, on January 20, 2022, Plaintiff filed Charge No. 440-2022-02582 with the IDHR and EEOC against Defendant for discrimination on the basis of age and retaliation.

10. He received a Notice of Right to Sue from the EEOC on or after June 30, 2023, and timely filed this complaint within 90 days of his receipt of notice of right to sue from the EEOC.

11. Plaintiff requested that the IDHR adopt the EEOC's findings Plaintiff will seek leave to amend this complaint upon receipt of notice of opt out of the investigative and administrative process, right to commence an action letter from the IDHR.

### Facts Upon Which Claims are Based

12. Mr. Nisbet began working for Defendant in February 1998 as a Service Advisor.

13. Around October 2015, he began transitioning to the Service Director position, and around January 1, 2016, he formally assumed this role.

14. Mr. Nisbet was highly qualified for the Service Director position. In addition to his years of experience, he had fulfilled all educational requirements from Ford Motor Company and Kia Motors of America for this position.

15. He also earned several certifications, including the Ford Master Certification for Commercial Service Manager and the Kia Master Service Manager Certification.

16. Throughout his employment, Mr. Nisbet performed the duties and responsibilities of his position in a satisfactory manner and met and often exceeded all legitimate expectations. For example,

   a. Mr. Nisbet earned several raises, rewards and prizes, incentives, and bonuses. In fact, his monthly pay was structured with the opportunity to earn a bonus in four different categories, and he frequently earned bonuses in three or more categories.

   b. He regularly earned praise from his managers and the owner Al Meyer. For example, Al Meyer praised Mr. Nisbet for reaching levels that he had never imagined possible.

   c. Mr. Nisbet was successful at attracting and servicing large commercial fleet customers that when Ford Motor Company decided to start a Service Fleet department, the company selected Mr. Nisbet to create and narrate an

        instructional video to demonstrate this new program that was offered around the country to other Ford Service Departments.

    d. He earned the Ford Employee Excellence Award on many occasions.

17. Mr. Nisbet also contributed significantly to the Defendant's success. For example,

    a. His dealership was selected to roll out multiple pilot programs, and due to Mr. Nisbet's leadership, his team implemented various repair processes, including the Ford Mobile Fleet Service.

    b. Mr. Nisbet also contributed significantly to the Defendant winning the prestigious Ford President's Award for multiple years.

    c. During Mr. Nisbet's tenure as Service Director, his team broke the all-time sales record and continued exceeding that record on multiple occasions up until his termination.

    d. After Mr. Nisbet began managing monthly labor sales forecasts, he increased monthly labor sales to more than double and continued this trend throughout his employment. Sales and customer service objectives during Mr. Nisbet's employment as Service Director exceeded expectations.

    e. Mr. Nisbet led the Service Department to record-breaking sales for many months.

**Mike Meyer Begins Replacing Al Meyer**

18. Around 2019, Mike Meyer (approximately age 27 at the time), the owner's son, began assuming more responsibilities to prepare him to take over the Dealership Principal position. The Dealership Principal position is the highest-ranking position at Defendant, with the authority to hire, terminate, and take other employment actions over its employees.

19. As Mike Meyer assumed authority as the Dealership Principal, he began to take adverse employment action against Defendant's older workforce.

4

20. Around the Spring of 2020, Al Meyer retreated to his home in Florida due to the pandemic and Mike Meyer fully assumed the Dealership Principal role.

21. Mike Meyer began overseeing Mr. Nisbet's employment.

22. Mike Meyer began pushing out older management-level employees and/or forcing them into retirement, including but not limited to the General Manager, Finance Manager, and Sales Managers, all of whom were at least 60 years old.

23. Mike Meyer also treated older employees more adversely than younger employees. Among other things, Mike Meyer:

    a. Was dismissive of older employees;

    b. Began excluding older employees from meetings that they should have been invited to attend, including Mr. Nisbet; and

    c. Regularly scrutinized the work of older employees and reprimanded them for things that younger employees were not reprimanded for.

24. Mr. Nisbet complained about this to Al Meyer. Instead of investigating Mr. Nisbet's concerns, Al Meyer was dismissive, telling him: "It's a generational thing" or words to that effect.

**The Covid-19 Pandemic**

25. For many years, the Centers for Disease Control and the World Health Organization have been warning about the possibility of an airborne virus that could cause a worldwide pandemic.

26. COVID-19 is a highly contagious airborne virus that rapidly spread across Illinois and the United States. COVID-19 is an organic human pathogen that can be present outside the human body in viral particles.

27. On March 11, 2020, the World Health Organization declared that the emerging threat of COVID-19 constituted a global pandemic.

5

28. Hundreds of thousands of people have died as a result of COVID-19 and millions have been infected.

29. The World Health Organization has reported that COVID-19 can spread when infected persons contaminate physical objects and surfaces, and then other people touch those objects or surfaces.

30. Emerging research on the virus and recent reports from the CDC indicated that the COVID-19 virus physically survives on surfaces for at least 17 days, a characteristic that rendered property exposed to the contagion unsafe and dangerous.

31. On March 9, 2020, Illinois Governor JB Pritzker signed a disaster proclamation for the coronavirus. In part, it mandated that "the Illinois Department of Public Health is further directed to cooperate with the Governor, other State agencies and local authorities, including local public health authorities, in the development of strategies and plans to protect the public health in connection with the present public health emergency."

32. On March 13, 2020, then-President Trump declared a nationwide emergency and on April 2, 2020, as the pandemic worsened, Governor Pritzker issued another disaster proclamation stating that there was a public health emergency in Illinois under the Illinois Emergency Management Agency Act.

33. At the outset of COVID-19, Mr. Nisbet regularly raised concerns to Dealership Principal Mike Meyer about Willowbrook's lax approach to safety during the pandemic, including but not limited to regular complaints about the shop's exhaust ventilation system not working, which had been down for a number of years.

34. Mike Meyer told employees that COVID was not a threat.

35. Since Willowbrook was not taking sufficient measures, Mr. Nisbet took it upon himself to protect his workers and himself by implementing safety precautions, such as limiting

6

unnecessary employee traffic into the Service office and spending his own money to buy disinfectant spray, hand sanitizer, and masks for his workers.

36. Mr. Nisbet put in a process to disinfect customer vehicles upon arrival at the facility, which Mike Meyer put a stop to. However, Defendant continued to advertise, falsely, to its customers that safeguards and special cleaning procedures were being implemented for their safety.

37. Mr. Nisbet suggested other safety measures to Willowbrook, like implementing a cleaning process, but Mike Meyer was dismissive and refused.

38. Mike Meyer frowned upon and mocked Mr. Nisbet's efforts to keep the workplace safe with COVID-19 safety protocols. For example, in one instance Mike Meyer entered the Service office where Mr. Nisbet and two other office staff shared space and licked his fingers and rubbed them on surfaces to mock and taunt Mr. Nisbet about his COVID-19 concerns.

39. Mr. Nisbet became increasingly concerned about the lack of and resistance to safety protocols. On several occasions, he told Mike Meyer and General Manager Brian that they were obligated to follow the Occupational Safety and Health Act ("OSHA") and that he believed Willowbrook was violating the OSHA. Mike Meyer was dismissive of Mr. Nisbet's concerns. Nevertheless, Mr. Nisbet remained concerned and continued raising safety concerns, his last complaint being around February 2021.

40. Around November 2020, Mr. Nisbet contracted COVID-19 and was off work for about two weeks. He continued to do some work from home.

**Things Escalate at Work for Mr. Nisbet**

41. In November 2020, while Mr. Nisbet was out sick, Mike Meyer assigned his responsibilities to another employee, Tim Ward. On information and belief, Ward was at least 10 years younger than Mr. Nisbet.

7

42. Around November 17, 2020, Mike Meyer told Mr. Nisbet that he could no longer work from home.

43. Having observed Mike Meyer push out older managers, Mr. Nisbet was concerned and asked Meyer if he was being replaced by Ward. Meyer warned him: "As long as you do exactly as Tim [Ward] and I say and you follow along with our program, you will have a job here for life" or words to that effect.

44. When Mr. Nisbet returned to work, he learned that Defendant had promoted Ward to a new position, Fixed Operations Director for the Willowbrook Group," and that Ward was now his direct supervisor.

45. Mr. Nisbet was never offered the opportunity to apply for consideration for the new Operations Director position despite that he was more qualified for the position and had more seniority than Ward.

46. Mike Meyer abruptly changed Mr. Nisbet's work hours on three separate occasions, upending his long-standing, years-long schedule without reason, which substantially interfered with his family responsibilities. Mr. Nisbet wanted to continue working for Willowbrook and adhered to the onerous schedule changes.

47. In or around January/February 2021, Mike Meyer instructed Ward to give Mr. Nisbet a false and unjustified verbal warning.

**Defendant Demands that Mr. Nisbet's Subordinates Work Unpaid Hours**

48. Around January/February 2021, Defendant ordered Mr. Nisbet to instruct his technicians to be at work 30 minutes before their scheduled start times, on an unpaid basis.

49. The technicians objected to coming to work 30 minutes before their scheduled start times since they were not going to be paid for that time.

50. Mr. Nisbet refused to break the law by forcing his subordinate employees to come to work and not be compensated for their time. On behalf of his subordinates, Mr. Nisbet told

8

Mike Meyer and Ward that they could not legally require an employee to punch in and work without compensation and that he refused to break the law.

51. Mike Meyer stated that he could require the employees to do whatever he wanted because they were "not union employees."

**Mr. Nisbet Faces Additional Retaliation**

52. On Mr. Nisbet's day off, one of the service advisors clocked in 3 minutes late. On March 22, 2021, Defendant terminated Mr. Nisbet's employment, telling him it was because he was the service advisor's supervisor.

53. The service advisor who arrived 3 minutes late was not disciplined.

54. Defendant did not discipline or terminate the supervisors of other employees from other departments who punched in late.

55. Following Mr. Nisbet's termination, Ward assumed the remainder of Mr. Nisbet's responsibilities, including overseeing the service advisors. When the service advisors continued to come to work late, Defendant did not discipline or terminate Ward.

56. Prior to being terminated, Mr. Nisbet had not received any disciplinary actions during his 23 years of employment with Defendant.

57. Shortly after he was terminated, Mr. Nisbet received a letter of recommendation from Al Meyer.

## COUNT I
### (ADEA – Age Discrimination & Retaliation)

58. Plaintiff restates and realleges by reference paragraphs 1 through 24, 41 through 47, and 52 through 57 above as though fully set forth in this Count.

59. Defendant intentionally subjected Plaintiff to unequal and discriminatory treatment by subjecting him to different terms and conditions of employment and terminating his employment because of his age, in violation of the ADEA, 29 U.S.C. § 621, *et seq*.

9

60. Defendant subjected Plaintiff to different terms and conditions of employment and terminated his employment in retaliation for having engaged in protected activity, i.e., complaining of and opposing unlawful discrimination, in violation of the ADEA, 29 U.S.C. § 623(d).

61. Defendant's actions in violation of the ADEA were willful.

62. Defendant's actions in intentionally discriminating and retaliating against Plaintiff have caused him lost wages and benefits, pecuniary losses, and other consequential damages.

**WHEREFORE**, Plaintiff prays this court to enter judgment on his behalf and against Defendant Willowbrook Ford, Inc. for:

A. All wages and benefits Plaintiff would have received but for the unlawful employment practices, including pre-judgment interest as permitted by law;

B. Reinstatement to his former position, or in lieu of reinstatement, an order of front pay and benefits for a reasonable period of time;

C. Liquidated damages;

D. Attorneys' fees and all costs and expenses of suit;

E. Post-judgment interest; and

F. Such other and further relief as the Court deems appropriate.

## COUNT II
### (IHRA Discrimination & Retaliation)

63. Plaintiff restates and realleges by reference paragraphs 1 through 24, 41 through 47, and 52 through 62 above as though fully set forth in this Count.

64. Defendant intentionally subjected Plaintiff to unequal and discriminatory treatment by subjecting him to different terms, privileges, and conditions of employment and terminating his employment because of his age in violation of the Illinois Human Rights Act, 775 ILCS 5/2-102.

65. Defendant terminated Plaintiff's employment in retaliation for having engaged in protected activity, i.e., complaining of and opposing unlawful discrimination, in violation of the Illinois Human Rights Act, 775 ILCS 5/6-101.

**WHEREFORE**, Plaintiff prays this court to enter judgment on his behalf and against Defendant Willowbrook Ford, Inc. for:

A. All wages and benefits Plaintiff would have received but for the unlawful employment practices, including pre-judgment interest as permitted by law;

B. Reinstatement to his former position, or in lieu of reinstatement, an order of front pay and benefits for a reasonable period of time;

C. Compensatory and punitive damages as allowed by law;

D. Attorneys' fees and all costs and expenses of suit;

E. Post-judgment interest; and

F. Such other and further relief as the Court deems appropriate.

## COUNT III
### (Common Law Retaliatory Discharge)

66. Plaintiff restates and realleges by reference paragraphs 1 through 7, 12 through 18, 25 through 47, and 52 through 57 above as though fully set forth in this Count.

67. At all material times, it was the clear mandate of the public policy of the State of Illinois to protect its citizens from retaliatory discharge for reporting and refusing to engage in unsafe working conditions, including COVID-19 health and safety measures and other violations of federal and state banking law and regulations.

68. Plaintiff engaged in protected activity by reporting and opposing Defendant's unsafe working conditions.

69. Defendant terminated Plaintiff in retaliation for reporting and opposing Defendant's unsafe working conditions.

70. At all material times, Defendant had the duty to refrain from terminating employees for reasons that violated the clear mandate of public policy of the State of Illinois.

71. Defendant acted with malice and in reckless disregard of Plaintiff's rights in terminating his employment.

72. As a result of his unlawful termination, Plaintiff has suffered lost wages and benefits, humiliation, and other compensatory and consequential damages.

**WHEREFORE**, Plaintiff prays this court to enter judgment on his behalf and against Defendant Willowbrook Ford, Inc. for:

A. Lost wages and benefits;

B. Compensatory and punitive damages; and

C. Such other and further relief as this Court deems appropriate and just.

## COUNT IV
### (Violation of the Illinois Whistleblower Act)

73. Plaintiff restates and realleges by reference paragraphs 1 through 7, 12 through 18, and 41 through 57 above as though fully set forth in this Count.

74. Defendant is an entity with one or more employees in this State. Plaintiff was employed on a full-time, part-time or a contractual basis by Defendant.

75. Defendant retaliated against Plaintiff, in whole or in part, for refusing to engage in wage violations as set forth by federal and state law, in violation of Section 20 of the Whistleblower Act. 740 ILCS 174/20.

76. Plaintiff had reasonable cause to believe that the wage violations disclosed above were a violation of a federal or state law or regulation.

77. As a proximate result of the retaliation, Plaintiff suffered damages. Plaintiff was damaged as a result of termination and lost income from being unemployed, future job choices were limited, and he suffered humiliation.

**WHEREFORE**, Plaintiff prays this court to enter judgment on his behalf and against Defendant Willowbrook Ford, Inc. for:

A. All damages available to him under the law;

B. Reinstatement;

C. Back Pay with interest;

D. Future lost earnings;

E. All damages sustained as a result of the violation;

F. Litigation costs

G. Attorneys' fees; and

H. Such other future relief as this Court deems appropriate and just.

## COUNT V
### (Violation of the Fair Labor Standards Act)

78. Plaintiff restates and realleges by reference paragraphs 1 through 7, 12 through 18, 41 through 57, and 73 through 77 above as though fully set forth in this Count.

79. Pursuant to 29 U.S.C. §215(a)(3) it is unlawful to "discharge or in any other manner discriminate against an employee because such employee has filed any complaint [….]."

80. Plaintiff had a good faith belief that the wage violations disclosed above were a violation of a federal or state law or regulation.

81. Defendant terminated Plaintiff for refusing to violate wage laws, refusing to force employees to work off-the-clock, and complaining that Defendant could not require an employee to punch in and work without compensation.

82. As a proximate result of the retaliation, Plaintiff suffered damages. Plaintiff was damaged as a result of termination and lost income from being unemployed, future job choices were limited, and he suffered humiliation.

**WHEREFORE**, Plaintiff prays this court to enter judgment on his behalf and against

13

Defendant Willowbrook Ford, Inc. for:

    A.    All damages available to him under the law;

    B.    Reinstatement;

    C.    Back Pay with interest;

    D.    Future lost earnings;

    E.    Liquidated damages;

    F.    All damages sustained as a result of the violation;

    G.    Litigation costs;

    H.    Attorneys' fees; and

    I.    Such other future relief as this Court deems appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all questions of fact raised by this Complaint.

Dated: September 28, 2023                         Respectfully Submitted,

                                                                  By: /s/ Thalia Pacheco_____
                                                                   One of the Attorneys for the Plaintiff

Thalia Pacheco
FISH POTTER BOLAÑOS, P.C.
111 E. Wacker Dr., Suite 2300
Chicago, IL 60601
(312)861-1800
tpacheco@fishlawfirm.com
docketing@fishlawfirm.com

## **CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that a true and correct copy of the above and foregoing **COMPLAINT** was served upon all parties through their below-listed counsel by e-filing on September 28, 2023 with the Clerk of the Court using the CM/ECF system.

                                                                       /s/ Thalia Pacheco