IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Bennet Nisbet, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 23 C 14242 |
| v. ) | |
| ) | Judge Jorge L. Alonso |
| Willowbrook Ford, Inc., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Bennet Nisbet contends that his former employer, Defendant Willowbrook Ford, engaged in age discrimination and retaliatory discharge. With discovery complete, Willowbrook now moves for summary judgment. For the reasons stated below, Defendant's motion for summary judgment is granted in part and denied in part.

**Legal Standard**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[S]peculation is not enough to create a genuine issue of fact for the purposes of summary judgment." *Tousis v. Billiot*, 84 F.4th 692, 696 (7th Cir. 2023) (citations omitted). Rather, the parties must support their arguments by citing particular parts of the record, including depositions, documents, declarations, and stipulations. *Horton*, 883 F.3d at 948. The Court views the facts and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.*

**Background**

Willowbrook is a car dealership located in Illinois. R. 88 ¶ 4. Willowbrook is owned and managed by Alan Meyer. *Id.* ¶ 6. Nisbet was hired by Willowbrook in 1998 to work as a Service Advisor. *Id.* ¶¶ 12–13. In January 2017, Alan promoted Nisbet to the position of Service Manager, and Nisbet began reporting to Alan. *Id.* ¶¶ 13–15.[1] Around 2019, Mike Meyer—Willowbrook's Vice President of Operations and Alan's son—began to assume some of Alan's responsibilities. *Id.* ¶ 7. Around March 2020, Nisbet began reporting to Mike. *Id.* ¶ 16. Then, around November 2020, Willowbrook hired Tim Ward to work as a Service Director, and Nisbet began reporting to Ward. *Id.* ¶¶ 10, 16. On March 22, 2021, Mike, Ward, and Nisbet had a meeting during which Mike terminated Nisbet. *Id.* ¶¶ 38–39.[2] After Nisbet was terminated, Ward assumed Nisbet's duties. *Id.* ¶ 42. As of March 22, 2021, Alan was 72, Nisbet was 51, Ward was 40, and Mike was 33. *Id.* ¶¶ 6, 9, 12.

In this lawsuit, Nisbet alleges five counts. R. 1. First, that Willowbrook violated the Age Discrimination in Employment Act ("ADEA") by engaging in age discrimination and retaliatory discharge. Second, that Willowbrook violated the Illinois Human Rights Act ("IHRA") by engaging in age discrimination and retaliatory discharge. Third, that Willowbrook violated Illinois common law by engaging in retaliatory discharge. Fourth, that Willowbrook violated the Illinois Whistleblower Act by engaging in retaliatory discharge. And fifth, that Willowbrook violated the Fair Labor Standards Act ("FLSA") by engaging in retaliatory discharge. Willowbrook now moves for summary judgment on all counts. R. 53.

---

[1] The parties dispute whether the proper name for Nisbet's position was "Service Manager" or "Service Director" but concede that the terms are interchangeable. R. 88 ¶ 15.

[2] Nisbet contends that Mike terminated him. R. 57-5 at 41–42. Mike contends that he demoted Nisbet, and Nisbet resigned. R. 57-7 at 56. As this is a disputed fact, the Court draws all reasonable inferences in Nisbet's favor and finds for summary judgment purposes that Nisbet was terminated.

**Discussion**

I. **Age Discrimination**

In Counts I and II, Nisbet claims that Willowbrook violated the ADEA and IHRA by terminating him due to his age. R. 1 ¶¶ 58–65. Age discrimination claims under the ADEA and IHRA follow the same analysis. *Walker v. City of Markham*, 676 F. Supp. 3d 623, 631 (N.D. Ill. 2023). And the question on summary judgment is "whether a reasonable jury could conclude [that] age was the cause of [the] termination." *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023). In the Seventh Circuit, a plaintiff "can rely on two frameworks to show discrimination." *Id*. First, a plaintiff "may proceed by introducing direct or circumstantial evidence that he suffered an adverse employment action because of his age." *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 911 (7th Cir. 2025). Second, a plaintiff may proceed under the *McDonnell Douglas* "burden-shifting framework." *Id.* Under the burden-shifting framework, a plaintiff must first "set forth a prima facie case of age discrimination" by showing the following elements: (1) plaintiff was over forty years of age; (2) plaintiff was meeting the employer's legitimate expectations, (3) plaintiff suffered an adverse employment action, and (4) similarly situated, substantially younger employees were treated more favorably. *Id.* If a plaintiff establishes a prima facie case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (citations omitted).

Here, Nisbet proceeds under the burden-shifting framework. R. 87 at 15. Nisbet can show the first and third elements of his prima facie case. As described above, Nisbet was terminated, which is an adverse employment action. And at the time of the adverse action, Nisbet was over forty years of age. This leaves the second and fourth elements.

### A. Legitimate Expectations / Pretext

The Court addresses the second element of legitimate expectations together with the issue of pretext. *See Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022) ("In some cases, the inquiry about whether an employee is meeting the employer's legitimate work expectations overlaps with the question of pretext. Where legitimate expectations and pretext overlap, [courts] can be more efficient by addressing both together."). Pretext "means a lie, specifically a phony reason for some action." *Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 746 (7th Cir. 2021) (citations omitted). In other words, pretext refers to "an employer's efforts to cover their tracks or hide their real reason" for the adverse employment action. *Id.*

To start, the following evidence supports a reasonable inference that Nisbet was meeting Willowbrooks's legitimate work expectations. First, Nisbet was promoted in 2017 after 19 years of working at Willowbrook. Second, Willowbrook employee Anthony LaGiglio—at Willowbrook from approximately 2019 through 2021—testified in his deposition that, based on his recollection of manager meetings, "[Nisbet] hit his goals pretty much." R. 88-4 at 14. Third, Willowbrook employee Michelle Johnson—at Willowbrook from approximately 2017 through 2021—testified in her deposition that Nisbet had been a "good service manager" and that he was "responsive to the concerns of the service advisors that reported to him." R. 57-10 at 7.

As stated above, the key question is whether Willowbrook can articulate a legitimate, nondiscriminatory reason for removing Nisbet from the position. The Court thus examines the reasons provided by Willowbrook to justify Nisbet's removal. When Nisbet was removed from his position on March 22, 2021, Willowbrook prepared a Counseling Record to document the meeting. The Counseling Record provides the following explanation for the adverse action taken against Nisbet:

4

> On Monday March 8th 2021 Willowbrook Ford became aware of a tardiness problem in service occurring on Saturday's. Managers present at the meeting were Michael Meyer, Ben Nisbet, and Tim Ward. On Monday the new dispatcher again made manager aware of tardiness on Saturday's. Tim Ward sent Ben Nisbet an email on Wednesday March 17th, 2021 outlining the issue. On Friday March 19th Management this time consisting of Tim Ward, Daniel Delatore, Brian Zawarus, Ben Nisbet, and Michael Meyer had a meeting to discuss the reassignment of Daniel's job duties. During this meeting it was brought up for a fourth time that there was a tardiness issue on Saturday. On Saturday March 20th Michael Meyer arrived at 6:30AM to ensure that the issue was being addressed by management. Tim Ward also showed up around 6:50 AM. At 7 AM there were no advisors present of the two scheduled and of the 7 technicians scheduled only two had shown up. Many staff began trickling in shortly after 7 AM including the receptionist. Of the 11 people scheduled in service only 3 were on time for work.

R. 88-10 (errors in original).

In its motion for summary judgment, Willowbrook identifies additional reasons to justify Nisbet's removal which were not included in the Counseling Record. Willowbrook contends that Nisbet was removed because: (1) he "failed to properly implement procedures suggested by a third-party consultant that were designed to increase dealership profits," (2) he was "unable to complete customer surveys in a timely manner," and (3) he "struggled to adequately manage the service team, as evidenced by an unprofessional outburst, the third-party consultant's observations, and the service advisors consistently arriving late for shifts." R. 54 at 14.

The only overlap between the Counseling Report and the motion for summary judgment is the assertion that "service advisors consistently arriv[ed] late for shifts." To an extent, the fact that the Counseling Report fails to mention the other justifications supports an inference that these other justifications are pretext. *See Murphy*, 140 F.4th at 915 ("[A]n employer's shifting and inconsistent explanations for an adverse employment action can support an inference of pretext."). Still, the Court examines the underlying evidence for each issue cited by Willowbrook.

5

First, Willowbrook contends in its motion for summary judgment that Nisbet failed to implement "procedures" suggested by consultant Paul Newton. R. 54 at 14 (citing Willowbrook's Rule 56.1 Facts, R. 88, at ¶¶ 19–21, 27, 46–52). But in the cited facts, Willowbrook identifies just one procedure actually at issue—Newton had recommended that Willowbrook employees conduct a walk-around when customers dropped their cars off at the dealership, and Willowbrook contends that Nisbet "failed to implement [the walk-arounds] consistently." R. 88 ¶ 21.

The relevant evidence is as follows. On one hand, Nisbet admits in his deposition that when "the pandemic came into play and social distancing become the recommendation by the leading health professions, I temporarily stopped [the walk-around] process in an effort to protect both the employees and . . . the customers from exposure." R. 57-5 at 62. But on the other hand, Mike Meyer admitted in his deposition that, during COVID, there were times when he did not require walk-arounds. *See* R. 57-7 at 39 ("Q. So . . . during COVID, you still directed [Nisbet] and the advisors that they had to complete the walk around at all times, is that correct? A. Not at all times, no."). And other Willowbrook employees confirm that walk-arounds were paused during the pandemic. In Ward's deposition, Ward stated that Willowbrook "didn't even do walk around[s] because of [COVID]." R. 57-11 at 29. Ward explained that at some point in the summer of 2021 or maybe as late as early 2022, Willowbrook "morphed into [a] modified walk-around." *Id.* And in Willowbrook employee Jimmy Marinez's deposition, Marinez stated that there was a "period of time" during COVID where "we weren't going to do walk arounds." R. 88-2 at 17.

Based on the evidence and drawing all reasonable inferences in Nisbet's favor, the Court cannot find that the walk-around issue was a legitimate, nondiscriminatory reason for Nisbet's termination. The pandemic hit in early 2020, so any initial violation of the walk-around policy by Nisbet would have occurred approximately a year before Nisbet was terminated. This time gap

supports an inference the walk-around issue was unrelated to the termination. And according to Ward, Willowbrook had not yet resumed walk-arounds by March 2021. The fact that Willowbrook lacked a clear policy on the extent to which walk-arounds were required around the time that Nisbet was removed further supports that the walk-around issue was unrelated to the termination.

Second, Willowbrook contends that Nisbet was "unable to complete customer surveys in a timely manner." R. 54 at 14. Specifically, Willowbrook contends that Nisbet was "issued a warning on February 24, 2021 for . . . leaving open Ford Motor Company Snapshot surveys for three days." R. 88 ¶ 31.

The relevant evidence is as follows. According to Nisbet's deposition: (1) on February 24, Nisbet had a meeting with Tim Ward and Brian Zawarus; (2) Ward stated that Nisbet had failed to complete Ford surveys in a timely manner because certain surveys had been left open for three days; (3) Nisbet responded by explaining that the Ford guidelines allowed for ten days to close surveys and that Willowbrook did not have a policy requiring a faster turnaround; (4) Ward stated that "to pacify Mike's demands," Ward needed to issue a verbal warning against Nisbet. R. 57-5 at 35–36. In Ward's deposition, Ward did not recall a discussion about pacifying Mike's demands. R. 57-11 at 34. But in their respective depositions, both Ward and Zawarus agree that the Ford guidelines allow for ten days to close surveys, and that Willowbrook did not have a separate policy. *Id.*; R. 57-8 at 30. Additionally, the Court is unaware of evidence showing that there were any additional problems with Nisbet failing to close surveys after this meeting.

Based on the evidence, the Court cannot find on summary judgment that the survey issue was a legitimate, nondiscriminatory reason for Nisbet's termination. Nisbet's surveys were left open for three days and the only official policy stated that the surveys had to be closed within ten days. Nisbet received a warning to complete the surveys in a timelier manner, and there is no

7

evidence to suggest that following the warning, he failed to do so. There is also no evidence to suggest that this was a habitual or repeated issue. Finally, there is a dispute of fact as to whether Mike Mayer somehow pressured Ward to target Nisbet regarding this issue.

Third, Willowbrook contends that Nisbet "struggled to adequately manage the service team, as evidenced by an unprofessional outburst, the third-party consultant's observations, and the service advisors consistently arriving late for shifts." R. 54 at 14 (citing Willowbrook's Rule 56.1 Facts, R. 88, at ¶¶ 30, 32–40, 51, 57). The Court addresses each of these in turn.

Regarding the unprofessional outburst, this refers to an incident that occurred on March 2, 2021. According to Nisbet's deposition: (1) on March 2, Nisbet received notice from employee Daniel de la Torre that de la Torre intended to quit; and (2) Nisbet informed Brian Zawarus, the general manager at Willowbrook. R. 57-5 at 37. According to Zawarus's deposition: (1) Nisbet was "very upset" that de la Torre was leaving and concerned that this would mess up the service department; (2) Nisbet raised his voice to Zawarus within earshot of customers; and (3) Nisbet was "very loud" and wouldn't calm down. R. 57-8 at 26–27. Mike Meyer's deposition testimony is consistent with Zawarus's deposition testimony. R. 57-7 at 49–50. And on March 8, 2021, Zawarus prepared a typed report of the March 2 incident that is also consistent with Zawarus's deposition testimony. R. 57-8 at 39. Nisbet maintains, however, that he was calm and professional during this exchange and that Zawarus's write-up is "absolutely false." R. 57-5 at 38. Whether Nisbet displayed unprofessional behavior on March 2 thus remains a disputed fact.

Whether Nisbet habitually displayed unprofessional behavior also remains a disputed fact. Zawarus, for example, testified in his deposition that he "was shocked" after March 2. R. 57-8 at 27. Zawarus explained that Nisbet "had never done anything like that before," that Nisbet "had never had an outburst like that before," and that Nisbet is "not that kind of person." *Id.* To the

8

contrary, however, in de la Torre's deposition, de la Torre agreed that Nisbet did "not all the time comport himself in a professional manner in the workplace" and that "it was in character for [Nisbet] to create a scene in the workplace." R. 57-12 at 28. De la Torre further stated that when Nisbet "was an advisor . . . and as a manger too," Nisbet had "confrontations with other advisors; and there were some heated arguments and no filter in front of customers." *Id.* Because the extent to which Nisbet displayed unprofessional behavior remains a disputed fact, the Court cannot find on summary judgment that Nisbet's unprofessional behavior was a legitimate, nondiscriminatory reason for Nisbet's termination.

Regarding observations by consultant Paul Newton, in Newton's deposition, Newton is highly critical of Nisbet. Newton stated, for example, that Nisbet "lacked conviction, . . . made excuses to what could and could not be done, . . . [and] didn't take responsibility for [] things that he should have." R. 57-9 at 22. But Mike Mayer terminated Nisbet, not Newton. As such, Newton's personal observations are irrelevant to establishing a legitimate, nondiscriminatory reason for Nisbet's termination unless they were communicated to Mike prior to Nisbet's termination. To that end, during Newton's deposition, Newton remembers having a conversation with Alan, Mike and Nisbet about Nisbet's performance. R. 57-9 at 52. But Newton was unable to recall specific details regarding what was said or when the conversation occurred. *Id.* ("Q: When was that conversation?" A. I don't have a clue, ma'am, but it had to do with Ben's performance."). Similarly, during Mike's deposition, Mike recalls that at some point after July 2020, Newton told him that Nisbet should be removed from his position. R. 57-7 at 42. He testified: "I know that came up. I don't know exactly when it came up." *Id.* Neither Newton nor Mike provide adequate evidentiary foundation for these conversations. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("[A] court may consider only admissible evidence in assessing a motion for summary

9

judgment."). And even assuming proper foundation, these are still partial memories lacking in substance and detail. The Court cannot rely on such evidence to find that Newton's observations provided Mike with a legitimate, nondiscriminatory reason for Nisbet's termination.

The Court turns to Newton's "close out reports," which Newton prepared after his visits to Willowbrook and circulated to Willowbrook's management team, including Mike. R. 57-7 at 28. The first report dates back to October 2018. For the October 2018, November 2018 and February 2019 reports, Newton copied the same language: "Overall observation, advisors are very acceptance [sic] of the new processes and the service manager is very engaged in the new processes and its successes. . . . All employees' attitude and demeanor [have] been a pleasure to work around. Great group!!!" R. 57-9 at 170, 184, 196. In the September 2019 report, Newton wrote: "Service manager needs to hold the advisors more accountable for [the walk-around] process." *Id.* at 211. In the December 2019 report, Newton wrote: "On this visit trainer worked with service manager on processes to increase business revenue." *Id.* at 225. And in the March 2020 report, Newton wrote: "On this visit, trainer worked with service manager on progress put in place from last visit to increase business revenue." *Id.* at 90. Aside from the recommendation in September 2019 that Nisbet should hold service advisors more accountable for walk-arounds, Newton's feedback regarding Nisbet was largely positive or at least neutral up through March 2020.

Newton provided negative feedback in the July 2020 report, and wrote: "The advisors feel from observation they do not need to follow the direction of the service manager and seem to have a lack of respect for his authority as the service manager. Service Manager needs additional training." *Id.* at 72. And in the October 2020 report, Newton wrote: "Shop efficiency is low . . . Service manager needs to fully engage himself into the processes [and] also needs to understand forecasting, service drive efficiency and how to drive customer pay business back into the service

10

drive." *Id.* at 103. But in the January 2021 report, Newton returned to a neutral stance and wrote: "During this visit, trainer . . . worked on holding service managers accountable on new processes." *Id.* at 229. There are no reports in evidence following January 2021. The next relevant document is a letter to "Mr. Meyer" signed by Newton and dated January 27, 2022. Here, Newton wrote:

> I have enclosed a copy of the close-out reports outlining the details of our training plan [and] assessment for your team. In reference to Mr. Ben Nesbit [sic], our findings were the following: (1) Our evaluation of Ben Nesbit [sic], he didn't complete the tasks directed after instructed and coached following the training sessions with consistency. (2) He didn't follow the process that was put into place by Willow Brook [sic] Ford and instructed by the [trainer].

*Id.* at 108.

Critically, the January 2022 letter refers to close-out reports that purportedly provide more detail regarding Nisbet's poor performance. Newton was asked during his deposition if prior to the January 2022 letter, he ever told Willowbrook that Nisbet's performance was poor and Newton's response is that "[it] says that in the reports." R. 57-9 at 52. But the relevant reports from January 2021 leading up to the January 2022 letter are not before the Court. The January 2022 letter, standing alone, lacks specificity. It asserts, for example, that Nisbet did not complete certain tasks but fails to define which ones. Absent a review of the underlying reports between January 2021 and January 2022, the Court cannot find that the reports or that Newton's observations provided Mike with a legitimate, nondiscriminatory reason for Nisbet's termination.

Regarding Willowbrook employees arriving late, Nisbet received an email from Tim Ward on March 17, 2021. R. 57-11 at 75. The email warned Nisbet that service technicians had not arrived on time to their shifts. *Id.* The next Saturday, March 20, 2021, five service technicians and two service advisors were late for their shifts. R. 88 ¶ 37. Willowbrook contends Nisbet was in charge of managing these employees and responsible for their tardiness. *See id.* But Nisbet disputes

11

this and contends that de la Torre was in charge of the service technicians and thus that Nisbet should not have been terminated as a result of service technicians arriving late. *See id.* De la Torre left Willowbrook in March 2021, but it is unclear from the record when exactly he left. R. 57-12 at 4; *see also* R. 57-11 at 47. And it appears that de la Torre was still at Willowbrook as of March 19, 2021. *See* R. 88-10. There is thus a dispute of fact as to whether Nisbet was in charge of the service technicians and responsible for their tardiness. Drawing all reasonable inferences in Nisbet's favor, the Court cannot find that these late arrivals by Willowbrook employees provided Mike with a legitimate, nondiscriminatory reason for Nisbet's termination.

As discussed above, there is insufficient evidence for the Court to find on summary judgment that Willowbrook terminated Nisbet for a legitimate, non-discriminatory reason. For the purposes of summary judgment, the Court finds that Nisbet has established at least disputed facts regarding the second element of his prima facie case, that he was meeting Willowbrook's legitimate business expectations.

### B. Similarly Situated Employees

Regarding the fourth element of his prima facie case, when a plaintiff is terminated and his job responsibilities are absorbed by other employees, a plaintiff must establish "that he was *treated less favorably* than one or more similarly situated younger employees." *Miller v. Borden, Inc.*, 168 F.3d 308, 313 (7th Cir. 1999). An "employer who discharges a protected employee and either hires or retains younger employees to fill positions for which the older employee was qualified bears the burden of explaining its actions." *Id.* (citations omitted). The younger employees "need not be outside the protected class, i.e., under the age of forty, but they should be substantially—i.e., at least ten years—younger than the terminated employee." *Id.* (citations omitted).

12

Here, Ward absorbed Nisbet's job responsibilities after Nisbet was terminated and Nisbet contends that Ward was a similarly situated, substantially younger employee. Ward was more than ten years younger than Nisbet and thus "substantially younger." Nisbet argues that Ward was similarly situated because similar performance issues allegedly committed by Nisbet were also committed by Ward, and Ward was not terminated. R. 87 at 22. First, according to service advisor Jimmy Marinez, Nisbet enforced the walk-arounds more strictly than Ward. R. 88-2 at 17. Second, Ward also struggled to work with service advisors—Marinez, for example, found Ward difficult to work with. R. 95 ¶ 30. Third, according to employee Gail Kalemba, certain customers complained after Nisbet was terminated that Ward had poor customer service skills. R. 88-3 at 9. Based on this evidence, Nisbet has raised at least disputed facts that Ward was a similarly situated, substantially younger employee and that Willowbrook treated Ward more favorably.

Under the burden-shifting framework, Nisbet has set forth a prima facie case of age discrimination and Willowbrook has failed to articulate a legitimate, nondiscriminatory reason for Nisbet's termination. For these reasons, summary judgment is denied regarding Nisbet's age discrimination claims in Counts I and II.

## II. Retaliatory Discharge

In Counts I and II, Nisbet also claims that Willowbrook violated the ADEA and IHRA by terminating him in retaliation for engaging in a protected activity. R. 1 ¶¶ 58–65. Retaliation claims under the ADEA and IHRA follow the same analysis. *Walker*, 676 F. Supp. 3d at 632. To set forth a retaliation claim under the ADEA and IHRA, Nisbet must establish the following elements: "'(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two.'" *Id.* at 634 (citing *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010)).

In responding to Willowbrook's motion for summary judgment, Nisbet argues that he engaged in a statutorily protected activity when he complained to Alan Meyer around the summer or fall of 2020 that Mike Meyer was setting unrealistic expectations for Nisbet and that Mike was holding younger employees to a different standard than Nisbet. R. 87 at 23–24. But this conversation occurred between Nisbet and Alan, and Nisbet was terminated by Mike. "In order to demonstrate that a defendant was motivated to retaliate based on the plaintiff's protected activity, the plaintiff must first produce evidence that the defendant had actual knowledge of the protected activity." *Eaton v. J. H. Findorff*, 1 F.4th 508, 512 (7th Cir. 2021). "It is not sufficient that a decision-maker could have or even should have known about the employee's complaint." *Id.* at 513. Because Nisbet failed to provide evidence that Mike was aware of this conversation with Alan, summary judgment is granted to Willowbrook on Nisbet's claims for retaliatory discharge under the ADEA and IHRA.

In Count III, Nisbet claims that Willowbrook violated the common-law tort of retaliatory discharge. R. 1 ¶¶ 66–72. To prove the common-law tort, Nisbet must show "(1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy." *Levin v. Altisource Sols., Inc.*, 755 F. Supp. 3d 1021, 1046 (N.D. Ill. 2024) (citing *Walker v. Ingersoll Cutting Tool Co.*, 915 F.3d 1154, 1157 (7th Cir. 2019)). As described above and when construing the facts in the light most favorable to Nisbet, he was terminated. This leaves the second and third elements.

Regarding the second element, Nisbet contends that he was terminated because he "reported and opposed unsafe working conditions, including complaints about masks not being worn, social distancing not being followed, and the dealership not providing safety supplies, and stopping the walk arounds from taking place during the pandemic." R. 87 at 25. Specifically,

14

Nisbet testified in his deposition that when the pandemic came into play, he "temporarily stopped [the walk-around] process." R. 57-5 at 62. Nisbet further testified that "Willowbrook never enforced a mask mandate for employees" and that when Nisbet asked "Mike Meyer if [Mike] could require employees to wear masks when they were in close contact with other employees, that [Mike] laughed at [Nisbet] and ignored [Nisbet's] concerns." *Id.* at 52–53. Finally, Nisbet testified:

> When I would bring [COVID] matters to Mike's attention, that we would like to have hand sanitizer, we would like to have these [sic] protective equipment, he would laugh and say COVID is not a thing. And even at one point he came inside of my office where Kim, Gabby, and I were at and said, "You know how concerned I am about COVID?" And he licked his fingers and rubbed them all over the desk to the horror of Kim and Gabby.

*Id.* at 53. The second element requires that Nisbet prove "retaliation"—in other words, causality between the above actions and Nisbet's termination. For retaliation under Illinois common law, causality may be inferred from circumstantial evidence, including "(1) suspicious timing, ambiguous statements or behaviors; (2) evidence that similarly situated employees were treated differently; or (3) a pretextual reason for adverse employment action." *Levin*, 755 F. Supp. 3d at 1046 (citations omitted). Critically, as discussed above regarding the age discrimination claims, Willowbrook failed to articulate a legitimate, nondiscriminatory reason for Nisbet's termination. As such, there is circumstantial evidence of pretext. Additionally, there is evidence of statements and behaviors by Mike that were hostile to Nisbet's COVID complaints. Drawing all reasonable inferences in Nisbet's favor, Nisbet can establish the second element.

Regarding the third element, courts have held that where an employee has been terminated for adhering to Illinois COVID guidelines, "the discharge unequivocally violates a clearly mandated public policy sufficient to support a retaliatory discharge claim." *Sharenow v. Drake Oak Brook Resort LLC*, 614 F. Supp. 3d 623, 629 (N.D. Ill. 2022) (collecting cases). Here, Nisbet

15

tried to adhere to Illinois COVID guidelines by stopping the walk-arounds, and he also spoke with Mike Mayer to request that Willowbrook adhere to Illinois COVID guidelines which Willowbrook had been ignoring. As set forth in *Sharenow*, this is sufficient to support the third element. Drawing all reasonable inferences in Nisbet's favor, the Court finds that Nisbet has shown the required elements to proceed on Count III.

In Count IV, Nisbet claims that Willowbrook violated the Illinois Whistleblower Act. R. 1 ¶¶ 73–77. As relevant, an employer violates the Whistleblower Act if it takes "retaliatory action against an employee for refusing to participate in an activity [if] the employee has a good faith belief that such participation would result in a violation of a State or federal law, rule, or regulation." 740 ILCS 174/20. The analysis under Illinois common-law retaliatory discharge and the Whistleblower Act are "essentially the same." *Hubert v. Bd. of Educ. of City of Chicago*, 2020 IL App (1st) 190790, ¶ 35. And courts have held that COVID orders constitute a "law, rule or regulation under the Whistleblower Act." *See Sharenow*, 614 F. Supp. 3d at 628 (collecting cases). For the same reasons stated above regarding Count III, Nisbet may also proceed on Count IV.

Regarding Count V, Nisbet claims that Willowbrook violated the FLSA. R. 1 ¶¶ 78–82. "To establish a prima facie case of retaliation under the [FLSA], [a plaintiff] must show: (1) that he engaged in protected expression; (2) that he suffered an adverse employment action; and (3) that a causal link existed between the protected expression and the adverse action." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012). Again, as described above, Nisbet was terminated. This leaves the first and third elements.

Regarding the first element, a plaintiff must show that he made an oral or written complaint about conduct related to the FLSA and that he had an objectively reasonable and good faith belief that the conduct might violate the FLSA—but the plaintiff need not prove that the conduct, in fact,

16

actually violated the FLSA. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 17 (2011) (oral complaints allowed for FLSA retaliation claims); *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 895 (7th Cir. 2018) (plaintiff must have an "objectively reasonable" and "good-faith belief" that the conduct at issue violated the FLSA); *Sanders v. Mid City Salon Res., LLC*, 2008 WL 244292, at *8 (N.D. Ill. Jan. 23, 2008) (citations omitted) ("To establish a claim for retaliation under the FLSA, [the plaintiff] must show that she reported conduct under or related to violations of the federal minimum wage or maximum hour laws, whether or not the employer's conduct did in fact violate those laws, and that she had a good-faith belief that the FLSA might be violated."). As relevant, Nisbet claims that around December 2020 to January 2021, Mike Mayer directed service technicians—who were paid on an hourly basis—to arrive thirty minutes early to their shifts. R. 88 ¶ 76; R. 57-5 at 40–41. According to Nisbet, Mike stated: "we don't pay overtime." R. 88 ¶ 76. Nisbet complained that it was illegal to make employees work without compensation and he refused to allow the service technicians to work without pay. *Id.* Nisbet worked with Daniel de la Torre to ensure that the technicians were compensated for early arrivals. *Id.* ¶ 71. Also according to Nisbet, Mike was not pleased with Nisbet's pushback. *Id.* ¶ 76. This is sufficient to satisfy the first element. Nisbet made an oral complaint to Mike and had an objectively reasonable and good faith belief that not paying the technicians for their time would violate the FLSA.

Regarding the third element, causality can be inferred from circumstantial evidence just as under Illinois common law retaliation. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 973 (7th Cir. 2012) ("Circumstantial evidence, which allows a jury to infer retaliation, may include: (1) suspicious timing, ambiguous statements or behaviors; (2) evidence that similarly situated employees were treated differently; or (3) a pretextual reason for adverse employment action."). As discussed above, Willowbrook failed to articulate a legitimate,

nondiscriminatory reason for Nisbet's termination. Thus, drawing all reasonable inferences in Nisbet's favor, there is circumstantial evidence of pretext. Additionally, there is evidence that Mike expressed frustration with Nisbet's actions. This is sufficient to support the third element. Drawing all reasonable inferences in Nisbet's favor, the Court finds that Nisbet has shown the required elements to proceed on Count V.

## Conclusion

For the reasons stated above, Defendant's motion [53] for summary judgment is granted in part and denied in part. Summary judgment is granted to Defendant on the retaliatory discharge claims under Counts I and II. Nisbet may proceed on the following claims: Count I for age discrimination under the ADEA, Count II for age discrimination under the IHRA, Count III for retaliatory discharge under Illinois common law, Count IV for retaliatory discharge under the Illinois Whistleblower Act, and Count V for retaliatory discharge under the FLSA. The parties shall file a joint status report by 2/23/26 setting forth if the parties believe a settlement conference would be helpful in light of the Court's ruling. If the parties do not believe a settlement conference would be helpful, the joint status report set forth the anticipated length of trial and four options of agreed-upon dates for trial.

**SO ORDERED.**  ENTERED: February 18, 2026

**HON. JORGE L. ALONSO**
**United States District Judge**